

# IN THE
# TENTH COURT OF APPEALS

No. 10-20-00337-CV

# IN THE INTEREST OF J.I., A CHILD

**From the 361st District Court
Brazos County, Texas
Trial Court No. 19-001465-CV-361**

## MEMORANDUM OPINION

After a bench trial, the parental rights of appellants, Betty and Pete, were terminated as to their child, J.I.[1] Both Betty and Pete have appealed. In three issues, Betty challenges the factual sufficiency of the evidence to support two predicate grounds and the best-interest finding. In three issues, Pete alleges that the evidence is legally and factually insufficient to support two predicate grounds, as well as the best-interest finding. We affirm.

---

[1] To protect the identity of the child who is the subject of this suit, we refer to appellants by the pseudonyms "Betty" and "Pete." *See* TEX. FAM. CODE ANN. § 109.002(d); *see also* TEX. R. APP. P. 9.8(b).

# I.     STANDARD OF REVIEW

The standards of review for legal and factual sufficiency in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009). If multiple predicate violations are found by the factfinder, we will affirm based on any one ground because only one ground is necessary for termination of parental rights. *See In re J.S.S.*, 594 S.W.3d 493, 503 (Tex. App.—Waco 2019, pet. denied). Moreover, we give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## II.     TEXAS FAMILY CODE SECTION 161.001(B)(1)(D)

Betty and Pete allege that the evidence is factually insufficient to support the predicate findings that they: (1) knowingly placed or allowed the child to remain in dangerous conditions or surroundings under Texas Family Code section 161.001(b)(1)(D); and (2) engaged in an endangering course of conduct or knowingly placed the child with someone else who engaged in an endangering course of conduct under Texas Family Code section 161.001(b)(1)(E). Pete also alleges that the evidence is legally insufficient to support the predicate findings under subsections (b)(1)(D) and

(b)(1)(E). Additionally, Betty and Pete contend that the evidence is factually insufficient to support the best-interest finding. Once again, Pete also alleges that the evidence is legally insufficient to support the best-interest finding.

## A.    Applicable Law

Termination under subsection (b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (b)(1)(D) requires proof of endangerment, which means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). While "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (noting that it is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards). The danger to a child may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533. Furthermore, in considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no

pet.). Subsection (b)(1)(D) permits termination based upon only a single act or omission. *Jordan*, 325 S.W.3d at 721 (citing *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied)).

The trial court's findings under subsection (b)(1)(D) with regard to Betty and Pete are adequately supported by the evidence in the record. The impetus for J.I.'s removal was an incident that occurred while J.I. was in Pete's care. On April 18, 2019, Betty received a call from Pete while she was at work saying that he dropped J.I., who was two months old at the time of the incident. Pete explained that he slipped on a cheap plastic hanger that caused him to fall backwards and caused J.I. to be "launched" forward into the air, landing on laminate flooring on the right side of her head. Betty left work to check on J.I. Upon arriving home, Betty noticed that J.I. was abnormally posturing with her arms straight out in front of her; her eyes were fluttering; and she sounded like she was trying to cry but could not do so. Betty and Pete took J.I. to the hospital with their son, D.I., in tow.

Douglas Laird, a physician's assistant at Baylor Scott & White emergency room in College Station, Texas, evaluated J.I. at the hospital. During the initial evaluation, Laird noted that J.I. "was alert . . . responding to stimulus through the exam . . . was not unresponsive." During the physical exam, Laird noticed a little bruise on J.I.'s left cheek. Laird inquired about the bruise, and Betty and Pete blamed the bruise on a "clip-on

pacifier hitting the child in the face." However, Betty and Pete later changed their story to explain that the bruise was caused by D.I. pinching J.I. on the cheek.

A CAT scan and a skeletal survey x-ray of J.I.'s head did not reveal anything abnormal or any broken bones or injuries at that time. As such, J.I. was discharged from the hospital. Betty and Pete were instructed to bring J.I. back if she began to act differently, if she stopped responding, or if she vomited repeatedly, as these symptoms could be a sign of brain injury.

Laird was skeptical of the conflicting stories regarding the cause of the bruise on J.I.'s cheek, as well as Pete's explanation of the incident. Laird did not believe that either Betty or Pete were completely forthright. Laird also did not find it plausible that J.I. would be launched forward when Pete fell backwards after allegedly slipping on a hanger. Because of his suspicions, Laird made a report with the Texas Department of Family and Protective Services (the "Department").

CPS investigator Mary Watkins was assigned to this case. Watkins did a CPS history check and made contact with the family later in the afternoon on the same day J.I. was released from the hospital. Watkins was denied access to the home because Betty alleged that the house was in a state of disarray given that they were moving in August. Nevertheless, Watkins recounted that J.I. appeared to be a normal three-month-old baby, and she noted that J.I. did not cry or fuss during the visit. Neither Betty nor Pete expressed any concern about J.I.'s behavior during this meeting, and Watkins observed

J.I. moving her arms and legs with ease and no discomfort. Watkins made arrangements to view the home the following week.

When Watkins returned to Betty and Pete's home the following week, she found the house to be messy with items piled up on furniture, some spoiled food in the refrigerator, a foul odor of smoke and trash in the house, and clutter in the floor, especially in D.I.'s bedroom. *See In re A.T.*, 406 S.W.3d 365, 371-72 (Tex. App.—Dallas 2013, pet. denied) (concluding that the evidence was sufficient to support termination under subsections (b)(1)(D) and (b)(1)(E) where the evidence showed the child's room was in complete disarray, clean clothes were mixed with dirty clothes, animal feces were visible on the floor, and the room smelled of smoke, mold, urine, and feces). In the master bedroom where J.I. slept in a bassinet, the floor was cluttered with clothes and other items on the bed and all over the floor that could cause one to slip and fall while holding a baby. *See In re S.M.L.*, 171 S.W.3d at 477. During this visit, Watkins saw J.I. stir a little bit, though J.I. was asleep during the majority of the visit. J.I. did move her arms while sleeping, but Watkins could not really see J.I.'s legs move much because of the wrap Betty used to hold J.I. Once again, J.I. did not cry or fuss during the visit. Pete did not attend this meeting. Betty did not mention that J.I. had been acting strangely or was having any discomfort. Watkins confirmed that Betty and Pete were J.I.'s sole caregivers before and after the slip-and-fall incident and informed Betty that she needed to clean up the house. Watkins did

not hear from Betty until the evening hours of May 4, 2019, when things took a turn for the worse.

In the two weeks following J.I.'s discharge from the hospital, Pete noticed that J.I. was sleeping more; her color was off; and she was spitting up more than usual. Betty recounted that J.I. seemed sleepy and not interested in anything. She did not cry or fuss, which Betty thought was a red flag. However, neither Betty nor Pete took J.I. to the doctor to follow-up on their concerns.

As stated earlier, things changed on May 4, 2019. Betty recalled that she fed J.I. and put her down for a nap. Betty left J.I. in Pete's care while she went to shop at the Dollar General. After returning home, Betty noticed J.I.'s hand was twitching; her whole body was shaking; and she did not want to wake up. J.I. was kicking her legs "kind of strange." At this point, Betty and Pete took J.I. to St. Joseph's Hospital. J.I. was later prepared for Life Flight to Texas Children's Hospital.

Christopher Greeley, M.D., a professor of pediatrics at Baylor College of Medicine and medical director of the child-abuse program at Texas Children's Hospital, testified that J.I. was life-flighted to his hospital on May 4, 2019. Dr. Greeley testified that J.I. presented with symptoms of brain injury, including seizures, collections of fluid around her brain, and thirteen or fourteen serious fractures of her ribs and forearms. Additional x-rays revealed that J.I. also had fractures of her shin bones. Dr. Greeley explained that J.I.'s injuries were indicative of abuse. J.I.'s metaphyseal fractures involved a pulling or

twisting motion, which could not have been caused by a non-ambulatory child. Moreover, Dr. Greeley opined that J.I.'s rib fractures were not likely caused by the fall two weeks earlier, especially considering x-rays showed the rib fractures in various stages of healing. Dr. Greeley also stated that a single fall would be unlikely to cause J.I.'s forearm fractures. Furthermore, Dr. Greeley ruled out that J.I. suffers from brittle-bone disease, though her vitamin D levels were documented to be "a little low."

Later in his testimony, Dr. Greeley recounted that J.I. had retinal hemorrhaging, which is bleeding in the layers of the back of the eye. Based on his training and experience, such an injury in young children is caused by traumatic shaking and slamming. Dr. Greeley doubted that a short fall from the arms of a parent would have caused J.I.'s retinal hemorrhaging.

With regard to J.I.'s head injuries, Dr. Greeley reported that J.I. had swelling on the brain and an apparent injury to the "ligaments at the very top of her neck as it attaches to the bottom of her skull. And those have been described as being associated again, with a—an inflicted traumatic injury" similar to whiplash. Dr. Greeley noted that the research does not suggest that ligamentous injuries, such as that experienced by J.I., are caused by accidents. Dr. Greeley also noted that J.I. had "significant brain injury that showed evidence of lack of oxygen or hypoxia and ischemia, which basically means the brain is beginning to die back." An MRI scan of J.I.'s brain showed extensive damage to both sides of the hemispheres of her brain. According to Dr. Greeley, such injuries usually

end up causing the child to have significant developmental disabilities, including permanent wheelchair use and an inability to feed themself.

Based on the totality of J.I.'s injuries, Dr. Greeley did not find it plausible that they could be explained by a one-time slip-and-fall accident, as posited by Betty and Pete. *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (affirming the termination of parents' parental rights where the evidence indicated that the parents were the only caregiver and the injuries did not occur all at once and were the result of ongoing mistreatment); *see also In re J.D.*, 436 S.W.3d 105, 116 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (concluding that the evidence was sufficient to support a finding that the child's leg and arm fractures were the result of endangerment by the mother where an expert testified that the injuries were intentionally inflicted, that the injuries were inflicted at different times, and the mother was the child's sole caregiver). Furthermore, Dr. Greeley emphasized that injuries to the brain to the degree of J.I.'s injuries would have caused J.I. to be symptomatic very rapidly, usually within a few minutes. However, J.I. was not symptomatic at or shortly after the time of her April 18, 2019 visit to the hospital. Indeed, Dr. Greeley noted that: "The child appeared normal. I'm just saying that that injury, if it were to have happened on the 18th, would not have been quiet for two weeks and then show up suddenly with the child requiring critical care."

Watkins next heard from Betty at around 9:00 or 10:00 p.m. on May 4, 2019. In this phone call, Betty stated that J.I. was being transported to Texas Children's Hospital

because she was injured and was having seizures. Watkins next spoke with Betty on May 7, 2019, when Watkins requested that Betty drug test. Betty agreed to do so, but warned that Pete would test positive for marihuana because he last used that morning in the hospital parking garage because he was upset about J.I.'s condition.

Betty tested negative for drugs, but Pete admitted to using methamphetamine and marihuana on the weekend of April 21, 2019, just a few days after the slip-and-fall incident. Pete then admitted that he regularly smokes marihuana, but that he kept it out of the reach of everyone else in the house. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (noting that illegal narcotics use supports a finding that a child's surroundings endanger his physical and emotional well-being); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (stating that a history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, thus endangering his physical and emotional well-being). Watkins noted that as the investigation continued, Pete refused to cooperate.

Britney Bledsoe, a caseworker for the Department, testified that Betty had prior history with the Department. Specifically, the Department had two referrals regarding Betty in 2013. The first pertained to Betty's daughter, who no longer lives with Betty, having bruising all over her body, and the home was in disarray, much like a hoarder. The second referral alleged that Betty was seen "ripping her hair out" on the front porch during what appeared to be a "mental breakdown." Bledsoe recounted that the referrals

were merged into a single investigation. During this investigation, the Department learned that Betty's son, who also no longer lives with her, had suffered a broken arm from what was alleged to be a trip-and-fall accident. Both children made outcries of physical abuse by Betty and her boyfriend, Gary. However, Betty insisted that her daughter had fallen down the stairs and sustained bruising. As a result of the investigation, Betty was validated for physical abuse and neglectful supervision, and the case resulted in Betty's ex-husband getting custody of the two children with Betty having supervised visits.

The Department also called Betty's ex-husband and his wife to testify. Betty and her ex-husband were married from 2008 to 2013. Betty's ex-husband witnessed Betty slap her daughter, who was four years old at the time, causing a busted lip. He also saw Betty grab their son's arm "pretty hard," which caused bruising to the seven-or eight-year-old. Additionally, Betty's ex-husband witnessed "a lot of mental and emotional abuse" characterized by Betty "screaming" and "forcefully grabbing." Betty's ex-husband also recalled that he would often come home to find "the house would be full of dog feces and clothes everywhere, dishes everywhere, with bugs all through the kitchen and though the house" and that when the children were young, the dog feces was often within their reach.

Betty's ex-husband further explained that Betty has not progressed past the first step of visitation with their children because she refuses to keep up with her psychiatric

treatment for bipolar disorder. He also recounted domestic violence in their relationship, including an incident where she attacked him in his sleep and bit his face, tearing part of his lip and requiring stitches. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."). Betty also bit his cheek while in the car. Further, Betty's ex-husband also awoke to find Betty standing over him with a knife saying that she was trying to figure out whether to kill him or herself. *See id.* (noting that a parent's mental state may be considered in determine whether a child is endangered particularly if that mental state results in the parent engaging in conduct that jeopardizes the physical or emotional well-being of the child); *see also In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.); *In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (upholding a jury's determination of endangerment where the evidence showed mother's suicidal thoughts, suicide attempts, and neglect); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (stating that mental conditions and suicide attempts of a parent are factors in considering whether a parent engaged in conduct that endangered the emotional well-being of the child).

Betty's ex-husband's wife, who is a registered nurse, confirmed that she has observed Betty's visits with the children and that, on April 27, 2019, she was able to hold J.I., play with her, and changed her diaper. At this time, J.I. appeared to be a normal, happy baby. J.I. had full movement of her arms and legs, no discoloration, and did not

appear to be fussy, upset, or in pain. J.I. "presented to be a normal, happy four-and-half-month-old baby." Betty's ex-husband's wife also recounted that Betty's visits are "chaotic at times" and that Betty is "very short-tempered with—with them [the children]"; that Betty's hygiene is poor ; that "[Betty] doesn't smell very well. There are times you can tell that [D.I.] hasn't had a bath"; and that Betty yells and screams at the children eighty percent of her visitations. *See In re A.T.*, 406 S.W.3d at 371 ("While perhaps not the sole reason supporting termination, Mother's and Father's poor hygiene must certainly be considered."). Betty's ex-husband's wife also recalled that Betty called her when J.I. was life-flighted to Texas Children's Hospital. Betty did not mention the April 18, 2019 visit to the emergency room, nor did she indicate that J.I. had been acting differently. Betty made it sound as if an additional accident had occurred that same day. However, later in the conversation, Betty attributed J.I.'s condition to the slip-and-fall incident involving Pete.

Based on the foregoing evidence, we conclude that the evidence was sufficiently clear and convincing the support the trial court's findings under subsection (b)(1)(D) as to both Betty and Pete. The disputed evidence on the matter is not so significant that the trial court could not have formed a firm conviction or belief that its findings under subsection (b)(1)(D) were true as to both Betty and Pete. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266-67. Furthermore, looking at the evidence in the light most favorable to the findings of the

trial court, we conclude that a reasonable factfinder could have formed a firm conviction that Pete knowingly placed or allowed J.I. to remain in conditions or surroundings that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule Betty and Pete's first two issues on appeal.[2]

## B.    The Best-Interest Finding

In their third issues, Betty and Pete challenge the trial court's best-interest finding. Specifically, Betty contends that the evidence is not factually sufficient to support the best-interest finding. On the other hand, Pete challenges both the legal and factual sufficiency of the best-interest finding.

When deciding the best-interest issue, we consider the well-established *Holley* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *See Holley v. Adams*, 544 S.W.2d 367, 371-72

---

[2] Because we conclude that the evidence is sufficient to support the trial court's findings under subsection (b)(1)(D) as to both Betty and Pete, and because only one ground is necessary for termination of parental rights, we need not address the subsection (b)(1)(E) findings as to Betty and Pete. *See* TEX. R. APP. P. 47.1., 47.4; *see also In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *In re J.S.S.*, 594 S.W.3d 493, 503 (Tex. App.—Waco 2019, pet. denied).

(Tex. 1976); *see also In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). The Department need not prove all the *Holley* factors as a "condition precedent" to termination, and the absence of evidence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination of parental rights is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

In the instant case, J.I., who was less than a year old at the time of trial, is too young and physically unable to express her desires. However, the child has been placed with foster parents, one of which is a registered nurse, and this placement is safe and stable. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting that when a child is too young to express his or her desires, the court may consider the quality and extent of his or her relationships with prospective placements, and evidence that a child is well cared for and is bonded with the foster family and has spent minimal time in the presence of his or her parents). Bledsoe described the foster parents with high praise and emphasized that the foster parents wish to adopt J.I. *See In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc) (noting that the need for permanence is a paramount consideration for a child's present and future physical and emotional needs).

The evidence also demonstrates J.I.'s extensive needs now and in the future. Indeed, the foster mother described J.I.'s day-to-day care as being a "total, full case." More specifically, she noted,

> [J.I.] cannot do anything for herself. She needs to be picked up, put in—on the bed and removed. She needs to be fed. She needs—using the feeding tubes. She doesn't feed by mouth. And during the time she's finished, she needs to be observed constantly because she has the aspiration risk. And she needs to be transported to the bathroom all—you know, to be showered in the bathroom and strapped. It's—you know, there's really nothing that [J.I.] can do for herself. She's actually in total care, you know.

Additionally, Dr. Kate Carlan, J.I.'s pediatrician, noted that J.I. lacks swallowing coordination, has cerebral palsy, has not had much improvement in her cognitive functioning in the year preceding trial. Dr. Matthew Stephen, a pediatric endocrinologist, also explained that because of her brain injury, J.I. began early puberty at ten months of age and that she requires once-monthly intramuscular injections to suppress puberty. Furthermore, Dr. Rabia Qaiser, a pediatric neurosurgeon, opined that J.I. has plateaued for about a year and that she will not become independent. J.I. also requires regular Botox injections to combat hip subluxation.

Bledsoe stated that:

> Yes. [J.I.] is a—she's a beautiful baby girl. She is not aware of her surroundings. I mean, she—she hears a noise and it's a reflex to jump, but her eyes won't go to what's making the noise. She's doesn't have a social smile. Every movement that she has is not intentional. I—on one or my more recent visits with her, she shook the whole time because she has really bad tremors and these go on all day and night. And she just doesn't look comfortable.

Furthermore, the record contains evidence that: (1) J.I. suffered numerous, severe, life-altering injuries while in the sole care of Betty and Pete; (2) Dr. Greeley testified that J.I.'s injuries were the result of multiple inflicted traumas; (3) Betty and Pete insisted that J.I.'s injuries stemmed from a one-time slip-and-fall accident; (4) Dr. Greeley found Betty and Pete's explanation for J.I.'s injuries to be implausible and unlikely; (5) Pete admitted to using methamphetamine a day or two after dropping J.I.; (6) Pete used marihuana in the hospital parking garage a couple days after J.I. was life-flighted to Texas Children's Hospital; (7) Betty has a history of mental illness and physical abuse of her older children whose injuries were also explained by slip-and-fall incidents; (8) Betty has poor hygiene, and her messy living conditions endanger her children; and (9) Betty has engaged in domestic violence and suicide threats with her ex-husband.

Based on the foregoing evidence, the trial court was permitted to consider Betty's past misconduct, including physical abuse; placing children with Pete, who admits to regularly using drugs; and J.I.'s life-altering injuries with no plausible explanation, and infer that Betty would engage in further misconduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) (stating that evidence of past misconduct or neglect can be used to measure a parent's future conduct); *Ryan v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is prologue."); *see also In re A.M.*, 385 S.W.3d 74, 82-83 (Tex. App.—Waco 2012, pet. denied) (concluding that evidence of Mother's history of neglecting and endangering children by exposing them to domestic

violence supported the trial court's finding that termination was in the child's best interest).

Accordingly, we find that the above-mentioned evidence touches on several of the *Holley* factors and that those factors weigh in favor of the trial court's order of termination. *See* 544 S.W.2d at 371-72. Therefore, considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Pete's parental rights was in J.I.'s best interest. *See id.*; *see also In re J.P.B.*, 180 S.W.3d at 573. We further hold that, viewing the evidence in a neutral light in relation to the *Holley* factors, the trial court could have reasonably formed a firm belief or conviction that termination of both Betty and Pete's parental rights was in J.I.'s best interest. *See Holley*, 544 S.W.2d at 371-72; *see also In re C.H.*, 89 S.W.3d at 28. Thus, we conclude that the evidence is sufficient to support the trial court's best-interest finding. As such, overrule both Betty and Pete's third issue.

## III.   CONCLUSION

Having found no reversible error, we affirm the judgment of the trial court.


JOHN E. NEILL
Justice

Before Chief Justice Gray,
 Justice Neill,
 and Justice Johnson
(Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed April 14, 2021
[CV06]

*(Chief Justice Gray concurs in the Court's judgment. A separate opinion will not issue. Chief Justice Gray notes, however, that while the evidence may support the required findings for the predicate act of endangering conditions, ground D, the evidence supporting endangering conduct, ground E, is overwhelming.)

